IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 786-734-4433, THAT IS STORED AT PREMISES CONTROLLED BY VERIZON | Case No.: 4:21mj240-MAF<br><br>**Under Seal** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Patrick N. Sanford, being first duly sworn, hereby deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. Your affiant makes this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned with call number **786-734-4433** (the "**TARGET PHONE**") that is in the custody or control of Verizon, a wireless communications service provider headquartered at 4 Sylvan Way Parsippany, NJ 07054. As a provider of wireless communications service, Verizon is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search



warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require Verizon to disclose to the government the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. Your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Your affiant is a Special Agent with the Federal Bureau of Investigation ("FBI") and has been so employed for approximately twenty-two (22) years. Your affiant is currently assigned to the Jacksonville Field Office, Tallahassee Resident Agency. As part of my duties, your affiant investigates crimes including but not limited to Hobbs Act robberies, bank robberies, computer related crime, fraud, public corruption, national security matters, and several others. Your affiant received training on the proper investigative techniques for these violations, including the application and execution of arrest and search warrants. Your affiant has conducted and assisted in hundreds of criminal investigations and has been the affiant or has been involved in dozens of search warrants that have led to the seizure of evidence related to violent crime. Prior to working as an FBI Special Agent, your affiant was a police officer in Montgomery, Alabama, from 1995 to 1999.

4. This affidavit is based upon my personal knowledge; my review of documents and other evidence; and my conversations with other law enforcement officials. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that your affiant has learned during this investigation.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2113 (Bank Robbery) has been committed by Johnson Saint-Louis, DOB 11/15/1984 (hereinafter "SAINT-LOUIS"). There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

6. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. On September 29, 2021, at approximately 11:00 p.m., the Tallahassee Police Department ("TPD") responded to a report of an armed robbery of an automated teller machine ("ATM") technician who was working on the ATM at the

Bank of America ("BOA") located at 5676 Thomasville Road, Tallahassee, Florida 32312.[1]

8.  The ATM technician arrived at the ATM at approximately 10:31 p.m. and was fixing a jam on the cash dispense part of the ATM. The technician had removed all five cassettes that contained the cash for ATM withdrawals and stacked them in the ATM lane in front of the machine to look for a part that broke, which caused a belt to slip.

9.  While the technician was looking inside the machine, at approximately 10:53 pm, a male suspect approached and pointed a gun at him. The suspect told the technician to sit down, turn around and not to look at him. The suspect was armed with a black handgun. The technician walked to the other side of a brick column by the ATM lane while the suspect began opening the cassettes and removing the cash. The technician stated when he realized the suspect wasn't holding the gun anymore, he started to run and scream for help. This caused the suspect to grab the remaining three cash boxes and run northbound through Barrington Park Condominiums.

10. A TPD K-9 conducted a track through the complex and ended at 2750 Chancellorsville Dr., a parking lot for a commercial building. A search of the area

---

[1] BOA is a "bank" as defined in 18 U.S.C. § 2113(f) because its deposits are insured by the Federal Deposit Insurance Corporation.

was conducted after the K-9 track, but no items of evidence were located. BOA provided initial screen shots of the suspect and victim during the armed robbery. The suspect got away with approximately $104,840 from the ATM. The suspect was described as a black male, approximately 6'0"-6'2" tall, athletic build, wearing a black hoodie, black pants and shoes, and black COVID-19 style mask.

11. Upon further analyzing the security video from earlier in the evening, an individual wearing a black baseball hat with a Miami Dolphins logo and a black COVID-19 mask drives up to the ATM in what appears to be a newer model grey Chevrolet Malibu. This individual conducts an ATM transaction where currency was dispensed, then he can be seen jamming currency back into feeder slot. This individual does this three times in a row, and on the third time, it appears the currency does not come back out of the slot. Subsequently, the ATM showed a feed error, causing the technician to be notified. In response to a federal grand jury subpoena, BOA corporate security identified that the account being accessed during these transactions belonged to SAINT-LOUIS.

12. BOA Corporate Security conducted further investigation of SAINT-LOUIS's account and located an ATM cash deposit transaction the day following the robbery on September 30, 2021, at approximately 8:47 a.m. at the BOA ATM in Pembroke Pines, Florida. Upon reviewing video surveillance of the transaction, a black male wearing what appears to be the same black baseball hat with the Miami

Dolphins logo and driving what appears to be the same grey Chevrolet Malibu, conducts a transaction wherein he deposits U.S. currency. When the subject first pulls up to the ATM, he is not wearing any facial covering, only the baseball hat. As the subject begins the transaction, he puts on a COVID-19 style mask that covers his nose and mouth.

13.  BOA Corporate Security also located another cash deposit transaction on the same account belonging to SAINT-LOUIS the following day on October 1, 2021, at approximately 11:36 p.m. This transaction was at the BOA ATM in Deerfield Beach, Florida. Upon viewing the video surveillance, a black male with dreadlocks drives up to the ATM in a white Mercedes SUV without any face covering, only wearing a hat. As the subject starts making a transaction, he then puts a COVID-19 style mask over his nose and mouth.

14.  Your affiant conducted a search of the Florida Department of Highway Safety Vehicle ("DHSMV") database and located a Florida driver's license for SAINT-LOUIS. Your affiant compared the driver's license photograph of SAINT-LOUIS and the surveillance footage of the subject driving the grey Chevrolet at the Pembroke Pines BOA ATM, and the white Mercedes SUV at the Deerfield Beach BOA ATM, and it appears to be the same person. The Florida DHSMV database also revealed that SAINT-LOUIS has a 2016 white Mercedes SUV registered in his name.

15. Your affiant identified a similar bank robbery which occurred at a BOA ATM on February 16, 2021, in Longwood, Florida, just outside of Orlando. The modus operandi was the same and a subject was observed on BOA surveillance video approaching the ATM on foot and tampering with the ATM prior to the service call being generated. Surveillance video also revealed a white Mercedes SUV with the same Florida license plate that is registered to SAINT-LOUIS, drive through the parking lot of the bank prior to seeing the individual on foot approach and tamper with the ATM. Subsequently, an ATM technician responded to a service ticket and was approached by a subject with a gun. The subject took approximately $130,000 from this robbery.

16. Your affiant conducted database research on SAINT-LOUIS, which revealed he was employed with Nautilus Hyosung, who builds and maintains bank ATMs utilized by BOA and other banks. Your affiant also learned that SAINT-LOUIS was employed as a technician from 2012 through 2019, during which he serviced ATMs at financial institutions. SAINT-LOUIS was investigated by the company along with Chase Bank for illegally accessing over 50 ATMs which resulted in approximately $292,000 in missing currency. SAINT-LOUIS was fired from the company in approximately May 2019.

17. SAINT-LOUIS's bank account information listed his telephone number as the **TARGET PHONE**. Several other database checks also revealed that

7

SAINT-LOUIS has utilized the **TARGET PHONE** for several years. Verizon also confirmed that the **TARGET PHONE** is registered to SAINT-LOUIS.

18. Based on my training and experience, your affiant knows that individual(s) involved in bank robberies often use and/or spend the robbed cash shortly after the robbery, and that such behavior may constitute evidence of such robbery.

## CELL-SITE INFORMATION

19. In my training and experience, your affiant has learned that Verizon is a company that provides cellular communications service to the general public. Your affiant also knows that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a wireless device

8

does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

20. Based on my training and experience, your affiant knows that Verizon can collect cell-site data on a prospective basis about the **TARGET PHONE**. Based on my training and experience, your affiant knows that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. Your affiant also knows that wireless providers such as Verizon typically collect and retain historical cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

21. Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

22. Based on my training and experience, your affiant knows that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. Your affiant also knows that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET PHONE's** user(s) and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

23. Based on the foregoing, your affiant requests that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

24. Your affiant further requests that the Court direct Verizon to disclose to the Government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on

Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Patrick N. Sanford
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this __12__ day of October 2021.

_____
MARTIN A. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

This warrant applies to records and information associated with the cellular device assigned call number **786-734-4433** ("the **TARGET PHONE**") that is in the custody or control of Verizon, a wireless communications service provider that is headquartered at 4 Sylvan Way Parsippany, NJ 07054.

## ATTACHMENT B

## Particular Things to be Seized

I.  **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a. The following information about the customers or subscribers associated with the **TARGET PHONE** for the time period **June 01, 2019 to October 12, 2021**:

      i. Names (including subscriber names, user names, and screen names);

      ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET PHONE**, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

**II.     Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2113 (Bank Robbery) involving JOHNSON SAINT-LOUIS and/or unidentified subjects during the February 22, 2021 and September 29, 2021 BOA bank robberies.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

3

personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in this Warrant.